[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 12-14203
Non-Argument Calendar

D.C. Docket No. 1:10-cv-01022-MHS

KENNETH M. ROGERS,

Petitioner-Appellant,

versus

HILTON HALL,

Respondent,

WARDEN,

Respondent-Appellee.

Appeal from the United States District Court for
the Northern District of Georgia

(May 30, 2014)

Before HULL, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Kenneth M. Rogers, a Georgia state prisoner proceeding pro se, is currently serving three consecutive life sentences followed by a twenty-year sentence for his state court convictions for rape, kidnaping, aggravated sodomy, and burglary.

Rogers appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After review of the record and consideration of the parties' briefs, we affirm.

## I. BACKGROUND

In December 1998, Rogers, a registered sex offender, entered the home of a young woman, raped her, forced her to perform oral sex on him, and stole from her. Rogers's DNA linked him to the crimes, and a Georgia jury convicted Rogers of rape, kidnaping, aggravated sodomy, and burglary. The state trial judge sentenced Rogers to three consecutive life sentences followed by a twenty-year sentence.

In 2005, Rogers's convictions became final. Prior to bringing his present § 2254 federal habeas petition, Rogers filed a counseled motion for a new trial (2002), a counseled direct appeal (2004), and a pro se petition for a writ of habeas corpus in state court (2005). Rogers was unsuccessful in each of these efforts.

Rogers then filed the instant pro se § 2254 petition for a federal writ of habeas corpus, raising eleven claims. The district court denied his § 2254 petition.

2

We granted a certificate of appealability ("COA") on these issues:

(1)     Whether the district court erred in denying Rogers's claim that his constitutional right to a speedy trial was violated;

(2)     Whether the state court's denial of Rogers's claim, that he was entitled to a new trial based on the trial court's gagging of him in the presence of the jury involved an unreasonable application of clearly established federal law, as determined by the Supreme Court; and

(3)     Whether the district court erred in finding that Claim 2(c) in Rogers's 28 U.S.C. § 2254 habeas petition [i.e., Rogers's claim that the state trial court erred in failing to declare a mistrial as a result of that gagging incident] was procedurally defaulted.

## II.  STANDARD OF REVIEW

We review de novo the district court's denial of habeas relief under 28 U.S.C. § 2254.  Cave v. Sec'y for Dep't of Corr., 638 F.3d 739, 743 (11th Cir. 2011).  The Antiterrorism and Effective Death Penalty Act of 1996 prevents federal courts from granting the writ on a § 2254 claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).

3

## III.  SPEEDY TRIAL CLAIM

### A.    Factual Background

Rogers committed the crimes underlying his convictions in December 1998. He was arrested in October 2000 and indicted in January 2001.  The indictment charged Rogers with rape, kidnaping, aggravated sodomy, and burglary.

After his January 2001 indictment but before his November 2002 jury trial, Rogers filed these motions:  a motion for bond (March 2001); two motions to acquit due to pre-indictment delay (March 2001 and April 2001); three motions for discovery (March 2001 and twice in May 2002); a motion for reconsideration of bond (October 2001); a motion for appeal of Rogers's November 2001 bond revocation (December 2001); a motion for extension of time to file an appeal regarding Rogers's November 2001 bond revocation (December 2001); a motion for speedy trial (May 2002); a motion to disclose favorable evidence under Brady and Giglio (May 2002); two motions to disqualify the trial judge (May 2002 and November 2002); two motions to disqualify the district attorney (October 2002 and November 2002); and a motion to remove his court-appointed public defender (November 2002).  Where appropriate, we discuss the facts and circumstances of these motions below.

4

Rogers retained counsel, and on March 5, 2001, attorney Dwight Thomas entered a notice of representation. On March 14, 2001, and again on April 2, 2001, Rogers, through his retained counsel Thomas, moved for an acquittal due to the delay between Rogers's October 2000 arrest and January 2001 indictment. These motions were denied.

In April 2001, the state trial court granted Rogers's motion for a surety bond, and Rogers was released on July 26, 2001. However, on September 17, 2001, Rogers was re-incarcerated for violating the terms of his surety bond. On October 3, 2001, through new retained counsel, Beverly Taylor, Rogers moved for a reconsideration of his bond revocation. The state trial court held hearings on Rogers's motion in October 2001 and November 2001 and revoked Rogers's bond on November 16, 2001.

On May 24, 2002, the state trial court held another hearing related to Rogers's criminal case. At all hearings prior to the May 24, 2002 hearing, Rogers appeared with retained counsel; however, no counsel appeared for Rogers at the May 24 hearing. The state trial court stated that it just learned that morning from Rogers that Taylor no longer represented Rogers.

Because Rogers no longer had funds to retain counsel, the state trial court entertained at the May 24 hearing—and ultimately granted at that same hearing—

5

Rogers's first motion to proceed in forma pauperis. At the same time, the state trial court also directed that a public defender represent Rogers in his criminal case.

At the same May 24 hearing, Rogers stated that—because his bond was revoked—he needed to change his prior defense plan, which was to get out on bond, hire attorneys, and work with witnesses "to defend [himself] properly." Because Rogers could not execute that defense plan as he originally intended, Rogers asked to file a motion for speedy trial. Rather than wait for the appointment of his public defender, Rogers asked to file a pro se written demand for a speedy trial in open court. The state trial court allowed Rogers to file that motion, too. In late May 2002, public defender Maryann Davidson was assigned to Rogers's case.

On October 15, 2002, the state trial court dismissed, among other motions, Rogers's May 24 pro se speedy trial demand as void because (1) "at no time prior to [Rogers's] filing of [the May 24, 2002 pro se] motion[] has his attorney(s) of record filed valid petitions to withdraw from his case" and (2) under Georgia rules, a criminal defendant represented by counsel cannot file a pro se motion.[1]

---

[1]Rogers has not directed this Court to any record filing where Taylor ever moved to withdraw or actually withdrew as Rogers's counsel. In July 2001, Thomas moved to withdraw

6

Shortly before his November 2002 trial, Rogers moved to remove his court-appointed public defender Davidson. On November 6, 2002, the state trial court held a final pre-trial conference, in which Rogers and his court-appointed public defender Davidson appeared.[2] At that conference, the trial court heard argument from counsel Davidson and Rogers regarding Rogers's motion to remove counsel Davidson as his attorney. At that same hearing, the trial court denied Rogers's motion.

The following day—just before voir dire, Rogers's counsel informed the trial court that Rogers wished to proceed pro se. After conducting a Faretta[3] colloquy, the trial court accepted Rogers's request to proceed pro se and asked his appointed counsel Davidson to stay on as standby counsel.

---

as Rogers's counsel, but Rogers also has not cited any record filing where Thomas's motion was granted.

[2]Public defender Claudia Saari assisted Rogers's counsel Davidson prior to trial and was present at this final pre-trial conference. At Rogers's request, prior to opening statements, Saari was relieved of her duty to assist Rogers. The day after counsel Saari was relieved of her duties, Rogers expressed an interest in having her assist him with the "DNA witnesses." Although she was excused by the state trial court, counsel Saari voluntarily returned to aid Rogers with those DNA witnesses at trial.

[3]Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975).

Rogers, now pro se, participated in jury selection and continued to act as his own counsel during the remainder of his five-day jury trial. Ultimately, the jury found Rogers guilty on all counts in the indictment.

## B.     Post-Trial Procedural History in State Court

After his jury trial, Rogers, with the assistance of newly appointed counsel Maurice Kenner, moved for a mistrial and appealed his convictions. In his motion for a mistrial and on direct appeal, Rogers argued, inter alia, that the state trial court should have dismissed the January 2001 indictment after the case was not tried in a timely fashion. In these filings, Rogers based his speedy trial claim on state law grounds only.

After holding a hearing on Rogers's motion for a new trial, the state trial court denied Rogers's motion because Rogers's speedy trial demand was untimely under Georgia law and the state trial court had never granted Rogers special permission to file his untimely speedy trial demand.

On direct appeal, the Georgia Court of Appeals examined the merits of Rogers's state law speedy trial claim and concluded that Rogers's speedy trial demand was untimely under Georgia law. Rogers v. State, 610 S.E.2d 679, 682 (Ga. Ct. App. 2005); see also O.C.G.A. § 17-7-170(a) (requiring a speedy trial to be filed "at the court term at which the indictment . . . is filed or at the next

8

succeeding regular court term thereafter"). The state appellate court also concluded that the state trial court had not exercised its discretion to grant Rogers special permission to file his otherwise untimely speedy trial demand. Rogers, 610 S.E.2d at 682; see also O.C.G.A. § 17-7-170(a) (permitting a state trial court to allow a defendant to file an otherwise untimely speedy trial demand).

Rogers renewed his speedy trial argument in his pro se state habeas petition. In that petition, Rogers again argued that his right to a speedy trial under state law was violated. He also argued, for the first time, that his federal constitutional right to a speedy trial was violated.

After holding a hearing on Rogers's claims, the state habeas court denied Rogers's state law speedy trial claim because it had been "decided adversely to [Rogers] on direct appeal and therefore [could] not be relitigated" in a state habeas petition. The state habeas court did not reach the merits of Rogers's federal constitutional speedy trial claim.

## C.    Federal Court Procedural History

Now, Rogers reasserts—in his federal § 2254 habeas petition—that his federal constitutional right to a speedy trial was violated. The district court found that Rogers's claim was procedurally defaulted because Rogers did not present his

9

speedy trial claim "in terms of federal law" when he raised it on direct appeal. Nevertheless, the district court reviewed the merits.

The district court stated that Rogers's only argument related to his Sixth Amendment speedy trial claim was that the length of the delay between his January 2001 indictment and November 2002 trial was impermissible. After reviewing the record, the district court concluded that the pre-trial delay was "due, at least in part, to numerous pre-trial motions filed by [Rogers], some of which were filed by his attorneys and others of which were filed pro se."

The district court also found that the state trial court appointed Rogers counsel the same day that Rogers requested counsel and that Rogers was tried within six months of his pro se speedy trial demand. Given these facts, the district court concluded that Rogers "fail[ed] to state a claim of post-indictment delay in violation of his Sixth Amendment right to a speedy trial."

## D.    Legal Principles Under the Sixth Amendment

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. "The speedy-trial right is 'amorphous,' 'slippery,' and 'necessarily relative.' " Vermont v. Brillon, 556 U.S. 81, 89, 129 S. Ct. 1283, 1290 (2009) (quoting Barker v. Wingo, 407 U.S. 514, 522, 92 S. Ct. 2182, 2188 (1972)). "It is consistent with

delays and dependent upon circumstances." Id. (quotation marks omitted) (alterations adopted).

The U.S. Supreme Court has "refused to quantify the [Sixth Amendment speedy trial] right into a specified number of days or months or to hinge the right on a defendant's explicit request for a speedy trial." Id. at 89–90, 129 S. Ct. at 1290 (quotation marks omitted) (alterations adopted). Instead of adopting such "inflexible approaches," the Supreme Court "established a 'balancing test, in which the conduct of both the prosecution and the defendant are weighed.' " Id. at 90, 129 S. Ct. at 1290 (quoting Barker, 407 U.S. at 529, 530, 92 S. Ct. at 2191–92). "Some of the factors that courts should weigh include [1] length of delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] prejudice to the defendant" (the "Barker factors"). Id. (quotation marks omitted) (alterations adopted).

**E.    Application to Rogers's Case**

Rogers argues that the district court erred in determining that his federal constitutional right to a speedy trial was not violated. We examine Rogers's argument by considering each of the Barker factors.

"The first factor, the length of delay, defines a threshold in the inquiry: there must be a delay long enough to be presumptively prejudicial." United States

11

v. Loud Hawk, 474 U.S. 302, 314, 106 S. Ct. 648, 655 (1986) (quotation marks omitted).  Here, there was a delay of approximately two years between Rogers's October 2000 arrest and his November 2002 trial.  A two-year delay in the trial of these serious charges with these severe penalties is presumptively prejudicial and triggers application of the other Barker factors.  See id.; Doggett v. United States, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1 (1992) ("[C]ourts have generally found postaccusation delay 'presumptively prejudicial' " when it approaches one year and such delay is generally "unreasonable enough to trigger the Barker enquiry").

The second factor, the reason for the delay, weighs heavily in the State's favor.  Rogers claims that the state trial court caused the pre-trial delay unnecessarily by failing to appoint Rogers new counsel in July 2001 (after his retained counsel Thomas moved to withdraw).  However, this ignores several facts, including that (1) in the fall of 2001, Rogers retained counsel Taylor; (2) Taylor appeared in the state court on Rogers's behalf; (3) Rogers did not move for in forma pauperis status or request appointed counsel until May 24, 2002; and (4) the state trial court immediately granted Rogers's request for court-appointed counsel the same day that Rogers requested counsel.  Moreover, Rogers was tried less than six months after he filed his pro se request for a speedy trial in open court.  And, as

12

the district court noted, at least a portion of that six-month delay was attributable to Rogers's many pre-trial motions.

The third factor, the extent to which Rogers asserted his speedy trial rights, also weighs heavily in the State's favor. Rogers's retained counsel Thomas filed a motion in April 2001 for acquittal based on the pre-indictment delay between Rogers's October 2000 arrest and his January 2001 indictment. Yet, Rogers never moved for a speedy trial. Rogers then retained new counsel Taylor in the fall of 2001; but, Rogers still did not assert his speedy trial right. In fact, Rogers did not assert his speedy trial right (or request court-appointed counsel) until May 24, 2002—some nineteen months after his arrest in October 2000. And, as the state appellate courted noted on Rogers's direct appeal, that nineteen-month delay rendered Rogers's May 24, 2002 pro se speedy trial request untimely under Georgia law.

The fourth factor, prejudice to Rogers, is a wash. It is possible that Rogers's right to a fair trial was impaired, as witnesses could have suffered loss of memory from the delay. See Loud Hawk, 474 U.S. at 315, 106 S. Ct. at 656. However, Rogers made no such argument before the district court or this Court. And, the "possibility of prejudice is not sufficient to support [Rogers's] position that [his] speedy trial right[] [was] violated." See id. Moreover, in this case, delay is a two-

13

edged sword. The State bore the burden of proving its case beyond a reasonable doubt. And, because its case depended on testimony from the victim, "[t]he passage of time may [have made] it difficult or impossible for the [state] to carry this burden." See id.

Moreover, when Rogers filed his pro se speedy trial motion on May 24, 2002, he noted that he was filing that request only because his bond had been revoked. Rogers stated that, prior to the revocation of his bond, he had intended to work with his retained lawyers and potential witnesses to prepare his defense, which suggests that Rogers had intended to waive his right to a speedy trial until he realized that he would not be re-released on bond.

In the district court, Rogers's only assertion of possible prejudice was that he was incarcerated from the time of his November 2001 bond revocation until his November 2002 trial. However, as noted above, (1) Rogers's own statement of his initial trial strategy reveals that he wanted at least some delay to prepare his defense, (2) Rogers was tried within six months of his speedy trial demand, and (3) at least some of that six-month delay was attributable to Rogers's many pre-trial motions. Therefore, to the extent that Rogers's post-bond-revocation incarceration was prejudicial, at least some of that prejudice resulted from Rogers's own trial strategies and tactics. Accord Brillon, 556 U.S. at 90, 129 S.

14

Ct. at 1290 ("[D]elay caused by the defense weighs against the defendant:  If delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine." (quotation marks omitted) (alterations adopted)).

Our balancing of the relevant factors leads us to agree with the district court that Rogers has not shown that he was denied his Sixth Amendment right to a speedy trial.  Our conclusion is bolstered by the fact that a defendant such as Rogers "generally must show actual prejudice where the first three factors do not weigh heavily against the [State]." See United States v. Villarreal, 613 F.3d 1344, 1357 (11th Cir. 2010).  Rogers has not met this burden.  Therefore, we cannot say that the district court erred in denying Rogers's Sixth Amendment speedy trial claim.[4]

## IV.  RESTRAINT CLAIMS

After warning Rogers at least 31 times that it would not allow Rogers to disrupt the trial, the state trial court had a bailiff cover Rogers's mouth with tape during the reading of one deposition.  Because the facts preceding the taping of Rogers's mouth are important to our analysis, we review the factual background of Rogers's case in detail before applying those facts to the legal principles

---

[4]We also agree with the district court that Rogers's federal speedy trial claim is procedurally defaulted.  However, the State did not raise the procedural default argument on appeal, so we do not discuss it further.

15

disseminated by the U.S. Supreme Court in Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057 (1970).

## A.    Factual Background

The day before jury selection in Rogers's trial began, the state trial court held a pre-trial conference wherein Rogers was represented by court-appointed counsel Davidson.  In that conference, the trial court instructed Rogers to express anything that he wanted to express to the court through his appointed counsel.  The trial court also told Rogers:  "I will insist on strict protocol being observed in this courtroom throughout the course of this trial.  . . .  I'm cautioning you, please do not attempt to disrupt this case.  I will not tolerate it.  Do you understand that, sir?"  Instead of answering the court's question, Rogers responded with complaints about his court-appointed counsel.  The trial court reiterated, "[I]f you attempt to disrupt this case, we are going to have problems.  All right?"  (Warning #1).

The next day, prior to voir dire, the state trial court asked Rogers if he had a notepad so that he could write down his notes and communicate with his counsel. Rogers refused to answer the court's question and, instead, made repeated remarks about how he would not work with his appointed counsel and about how things were "not going to work."  The trial court asked Rogers to "[b]e quiet."  The following exchange then occurred:

16

Rogers: I have been quiet long enough, Your Honor.

Court: Did you get what I asked . . . yesterday? Mr. Rogers, I'm telling you this for the last time. You don't have the right just to run your mouth.

Rogers: I'm not running my mouth. I'm talking. I have a right to talk. I have a right to say something.

Court: You have a right to answer questions. Now, if you choose not to communicate with your counsel, that's your choice. (Warning #2).

The trial court then took a recess. After the parties reconvened, the trial court warned Rogers as follows:

I want you to understand something. We have had repeated hearings over the last several days and weeks and throughout the course of that entire time you have not in my view kept your mouth shut when you were told to keep your mouth shut. Now, before I bring [the venire members] in here, I talked to you yesterday about appropriate protocol. I have looked at the law carefully in this particular area a number of times with other defendants and I have reviewed it again in your case. I am telling you right now you have got counsel. You can communicate through that counsel and you can communicate when you have permission or leave by this court to communicate. If you cannot control that, I am telling you right now that I will do one of two things. I will have you gagged in front of this jury or I will have you removed and those are the two options that will be available to you if you continue and persist in this disrespectful, inappropriate fashion. You are attempting to derail the efficient and orderly procedure which is in place and which I have taken an oath to make sure we go through appropriately. (Warning #3).

17

Rogers's counsel then informed the trial court that Rogers wished to proceed pro se. The state trial court then asked Rogers whether he did, in fact, wish to proceed pro se. Rogers failed to answer the trial court's question directly, so the trial court asked its question again. Rogers snapped, "I'm not even going to answer that question, Your Honor." Based on Rogers's unwillingness to answer the trial court's question, the court stated that it would not excuse Rogers's court-appointed counsel. This prompted Rogers to state that he did, in fact, want to proceed pro se.

The state trial court then conducted a Faretta inquiry. During that colloquy, the trial court asked Rogers whether he understood that, if Rogers acted as his own counsel, the court must treat Rogers the same as any other lawyer in court would be treated. Instead of answering the trial court's question, Rogers re-raised his concern that his appointed counsel was inadequate. The trial court told Rogers that it had "heard enough on that [topic]." The trial court then warned Rogers that "in court you can't just say what you want to say." (Warning #4).

Ultimately, the trial court allowed Rogers to proceed pro se but asked his appointed counsel Davidson to stay on as standby counsel. Prior to jury selection, the state trial court again asked Rogers if he need "any notepads or anything?"

18

Instead of answering, Rogers quipped, "I'm not saying anything to anybody, if this is the game [the trial court] wants to play, I'm going to play it."

After selecting the jury and ruling on various motions, the trial court adjourned for the weekend.

The next trial day, before the jury was brought in to hear opening statements, the trial court informed the parties that it would excuse an empaneled juror whose father died over the weekend. The state trial court then explained that excusing that juror would leave one alternate and asked Rogers if he understood. Rogers responded that he understood "to the best of [his] ability" but that he was "incompetent." The trial court corrected Rogers and explained that it had found Rogers mentally and physically competent. The trial court then reminded Rogers that he had chosen to represent himself at trial. Rogers stated that he was proceeding pro se "involuntarily." After an exchange with Rogers regarding his pro se status, the trial court stated, "We've had these discussions." Rogers said, "Correct." As the conversation continued, the trial judge warned Rogers not to interrupt her. (Warning #5).

Also before the jury was brought in to hear opening statements, the trial court asked Rogers why he chose to remain in his prison clothes rather than change into other clothing that was made available to him. Rogers responded by restating,

19

once again, that he was dissatisfied that he could not have different counsel appointed for his trial: "I'm not going to continue to play this circus that you're allowing to go on, this mock trial of me being not under the Sixth Amendment of the United States Constitution to be fairly represented."  The following exchange then occurred:

Court:    All right.  Stop right there.  Stop right there.  Sit down and be quiet.

Rogers:   You keep cutting me off.  I mean, I can't speak.

Bailiff:   Be quiet and sit down.

Court:    Sit down and be quiet.

Rogers:   You need to let me have an opportunity to speak, your honor.

Court:    No, sir, I don't.

Rogers:   I see that.

Court:    So we understand something right here and right now, I'm not going to argue with you. . . . You have been given an opportunity to have counsel.

Rogers:   No, I haven't.

Court:    Sir?

Rogers:   I have not.

Court:    Sir, let me tell you something.  I told you this last week.  Inappropriate comments will result

20

> in one thing:  that is you being gagged.  I'll be
> happy to have that done if— (Warning #6).
>
> Rogers: You might as well make it a circus, it's already
> a circus.
>
> Court: All right.  Do you guys have a gag?  I want it.
> We're not going to go through this.  You're not
> going to disrupt this case.  You will be allowed
> the opportunity to talk and represent yourself in
> an appropriate fashion.  You will not be
> allowed to argue with this court, or just say
> anything you want to say.  This is a courtroom.
>
> Now, if you choose to continue in this manner,
> I am telling you right now, you will be gagged
> in the presence of this jury.  That is your
> choice.  (Warning #7).

At the trial court's instruction, Rogers's standby counsel advised Rogers that the court could, in fact, gag Rogers.  Even after receiving the court's warnings and standby counsel's advice, Rogers continued to argue with the trial court and insisted that he was being denied his "rights" because he was not provided "effective" counsel.

The trial court then told Rogers that he would be allowed to make an appropriate opening statement to the jury but warned, "The minute you attempt to disrupt this process, you will be restrained and gagged, if need be."  (Warning #8).  Shortly thereafter, the bailiff responded to a question from the trial court and noted that Rogers was "act[ing] a fool . . . here."

21

The trial court then disposed of various administrative issues and motions. During this process, Rogers continued to argue after the trial court denied one of his motions. So, the trial court warned Rogers, "Once I make a ruling, either you or the State is shut off at that point, all right?" (Warning #9).

Rogers then began to argue two other motions—one was similar to Rogers's earlier motion to disqualify the district attorney; the other was a motion to disqualify the district attorney for other grounds. The trial court told Rogers: "[A]t this point, I believe what's happening is you're filing motions because it delays. I'm telling you right now that any further motions that I deem to be inappropriate and untimely will not be considered by this court. . . . [W]hat I see developing is a pattern of delay." The trial court warned Rogers that it would not allow him "to continue to delay and obstruct th[e] trial." (Warning #10). After hearing the merits of Rogers's motions to disqualify the district attorney, the state trial court denied both motions.

The trial court then summoned the jury and gave the jury its preliminary instructions. The parties then made their opening statements. Rogers began his statement by stating that he was being "forced" to represent himself. The trial court warned Rogers to comply with the court's earlier instruction to only make appropriate remarks in his opening statement. Rogers replied, "I just wanted to

22

jury to know—," but before Rogers could complete his statement, the state trial court interrupted Rogers and excused the jury. The trial court then reminded Rogers that he was not being forced to represent himself and re-stated its earlier instruction that Rogers could not make such inappropriate statements to the jury. (Warning #11).

The trial court then asked Rogers if he understood that he could not tell the jury that he was being forced to represent himself. Rogers tried to interject that he needed to make such statement, which prompted the trial court to re-iterate that such comments were inappropriate and would result in Rogers forfeiting his right to make an appropriate opening statement. The following exchange then occurred

Court:  If you say it again, you will be told to sit down—

Rogers:  Duct taped.

Court:  —be quiet. That's an option, all right? So stick with appropriate opening statements. (Warning #12).

Rogers:  I mean, but I'm saying I should be entitled—I have a strategy.

. . .

Court:  The law provides that you are allowed to present appropriate opening statements.

Rogers:  That's what I'm getting ready to do.

23

> Court:   The word is appropriate. . . . You've been instructed.  Don't make that statement again to the jury.

The jury then returned to the courtroom, and Rogers gave his opening statement.  After the parties made their opening statements, the court excused the jury for the day.

After excusing the jury, the trial court took up administrative matters with the parties.  During one exchange with Rogers, the trial court had to tell Rogers four times "that's enough" when Rogers continued to speak.  After the trial court's fourth warning, Rogers blurted out, "This is ridiculous."  Once again, the trial court said, "That's enough."  The trial court had to make the same warning two other times before adjourning for the day.  (Warning #13).

The next day, before the jury was brought in to hear the first witness's testimony, the trial court told Rogers that he was "entitled to ask questions of witnesses" but warned, "The instant you stop asking questions and you just start jawing to the jury, I'm going to cut you off.  If you don't respond to me cutting you off, I will have you gagged."  The trial court also told Rogers that he could ask questions and raise objections but warned that he could not "say anything any time [he] want[ed]  to."  The court noted, "I've warned you about this several times, so I'm—this is the last warning you get, all right?"  (Warning #14).

24

Instead of answering the trial court's question, Rogers attempted to argue the precise time that he arrived at the law library the prior day (i.e., at 2:15 p.m., as the jail staff indicated, or 2:30 p.m., as Rogers indicated). The trial court admonished Rogers, as it had the day before, "[Q]uit wasting my time in this trial." (Warning #15).

Rogers then attempted to argue several motions, some of which the trial court had previously denied. So, the trial court cautioned, "Don't continue to restate motions that this court has ruled on. . . . I told you yesterday that I am not going to continue to allow you to just raise motions over and over and over again. You are attempting to obstruct the trial of this case and interfere with my administration of this trial. It's untimely, inappropriate. Move on." (Warning #16).

When Rogers persisted in his attempt to present motions and issues to the trial court, the court repeatedly instructed Rogers to sit down. When Rogers refused to quit speaking or sit, the court said, "[S]it down or be strapped down." (Warning #17). As Rogers continued to talk, the court said to the bailiff, "One more word out of his mouth, and gag him." (Warning #18). Rogers continued to speak, so the court instructed the bailiff to gag Rogers. But, before the bailiff

25

could gag Rogers, the court changed course and took a short recess. Before that recess could begin, Rogers again called the proceeding "a circus."

After the recess, the trial court stated:

> Now, Mr. Rogers, I've taken a break and I'm just telling you. This is the last time I'm telling you. You will quit interfering with this process. If you continue just to jabber on—I want the gag here, now, present, where I can see it, where he sees it. I am not going to tolerate him running his mouth in front of this jury. It's inappropriate and it's quite clear to me what he is trying to do.
>
> Now, I'm not going to waste this court's time or the taxpayers' time, or this jury's time with you running your mouth. This is your last warning. You can ask questions of witnesses. You can raise appropriate objections. Other than that, you sit there and keep your mouth shut.
>
> If you need an opportunity to address an issue that has not been raised, you will have that opportunity at regularly scheduled breaks. But here, once again, I find that we've wasted time. We are not going to waste more time in this case.
>
> Now, I don't know how to make it any clearer than that.
>
> (Warning #19).

The trial court then disposed of the remaining motions. Before witness testimony began, the trial court reminded Rogers that he was not allowed to approach any witness without the court's permission. As the trial court did so, Rogers

26

interrupted to again say that he was not functioning as an attorney.  Exasperated, the trial judge warned Rogers not to argue with the court.  (Warning #20).

The jury returned to the courtroom, and witness testimony began.  While cross-examining the victim, Rogers made several comments, including that the victim "wasn't sure" about how she was undressed during the rape and that her statements were "very contradictory."  The trial court repeatedly told Rogers to ask questions but not argue, testify, or comment.

Shortly thereafter, while Rogers was still while cross-examining the victim, Rogers made an off-hand comment in open court that the victim had made "two different statements."  The trial court immediately stopped the witness examination, sent the jury to the jury room, and asked the victim to exit the courtroom.  The court then told Rogers to stop making inappropriate commentary while questioning the witness and admonished, "The next time I hear something out of your mouth that is a comment about this witness's testimony or statements or anything else, you will forfeit your right to ask any further questions of this witness."  The trial court then warned, "Now, I have given you as much latitude as I possibly can.  I have explained it to you over and over and over again. . . . You will not continue to attempt to testify instead of asking questions."  (Warning #21). Rogers responded by again saying that it was the trial court's fault that Rogers did

27

not have counsel and was proceeding pro se.  Frustrated, the trial court said, "That's enough," and called a brief recess.  Rogers blurted out, "You're abusing your discretion."

After the recess, the witness and jury returned to the courtroom, and the trial continued.  During the cross examination of a nurse, Rogers made an off-hand remark about possible tampering with the seals on the rape kit by commenting that the seals must have "some kind of magic trick."  The trial court again told Rogers not to comment or testify while questioning witnesses.  But, Rogers, almost immediately, made another comment about the rape kit packaging having a hole in it.  This prompted the trial court to instruct the jury to disregard commentary from any attorney, including Rogers.  After instructing the jury, the trial court again warned Rogers to not add commentary to his questioning.  (Warning #22).

When Rogers objected to the admission of the rape kit, he added his belief that the rape kit was "tampered with" because it had "been opened, sealed and now resealed."  Once again, the trial court told Rogers not to testify.  (Warning #23).

During the remainder of Rogers's cross-examination of the nurse, the trial court repeatedly warned that Rogers not to testify or argue while questioning the witness.  (Warning #24).

During the direct examination of Rogers's prior rape victim, Rogers objected to the use of documents to refresh the witness's recollection by stating that the prosecutor was "playing unfair, dirty." Once again, the trial court warned Rogers not to testify while witnesses were under examination. (Warning #25). Rogers reiterated his objection to the refreshing documents and added: "[The prosecutor] said he didn't have a statement to Your Honor earlier, now he's giving a statement. I guess they mysteriously appear like everything else." Prompted by Rogers's continued impermissible testimony, the trial court asked the jury to step into the jury room. Before the jury could leave the courtroom, Rogers's blurted out, "Playing a game." The trial court then excused the witness.

After discussing the merits of Rogers's motion with the parties and counsel, the trial court overruled Rogers's objection. Then, the trial court, Rogers, and the bailiff had the following exchange:

> Court:  Now, I have warned you repeatedly about these offhand comments about how this is a game, this is a circus, just the comments you're making in the presence of this jury.
>
> You continue to do so, and this is the last, really, really, the last time, I'm going to have you seated, I'm going to have you gagged, and you just won't get to open your mouth until you have an opportunity to do cross-examination. And then I'll let you cross-examine until you

29

start testifying, until you start making these inappropriate statements.

You are not going to be allowed to do that. Now, if you want to sit there with some duct tape on your mouth, I'll do it. I don't have a problem with it. (Warning #26).

Rogers: Well, once again you've threatened me, your honor.

Court: That's right. Sit down.

Rogers: And I'm just doing the best I can.

Court: Sit down.

Rogers: If I had a lawyer I wouldn't have to go through all this here.

Bailiff: Sir, have a seat.

Rogers: All you have to do is give me a chance—

Bailiff: Sit down—down.

Rogers: I heard you. You ain't got to yell at me.

. . .

Court: Mr. Rogers, so you understand, if you continue to disrupt this case, I will have you removed and we'll proceed on this trial without you present. Now, if you force that issue, I will take that step. I don't want to do that, but if you continue this, you're going to force me to. (Warning #27).

30

Before the jury could be brought back in, Rogers again objected to the State's use of the refreshing documents. The trial court replied, "I don't want to hear any more arguments about the [documents]. Have a seat." Rogers retorted, "This is a joke here," to which the court scolded, "Sir, one more. One more." (Warning #28).

The next day, while discussing trial-related matters outside of the jury's presence, the trial court had to tell Rogers multiple times not to interrupt and to "hold on" when Rogers spoke out of turn. (Warning #29). The trial court observed that Rogers had "refused to close [his] mouth upon instruction after instruction after instruction outside of the presence of the jury." The court noted that, in such instances, the bailiffs had to move nearer to Rogers "to attempt to get [Rogers] to get . . . control of [him]self, sit down, and be quiet."

Rogers again argued that he was being "forced" to represent himself, and the trial court told Rogers twice more to move on because that issue had already been decided.

The jury then entered the courtroom, and witness examination continued.

The trial court then excused the jury and took up administrative matters. One such matter related to Rogers's assertion earlier that day that an officer made Rogers take his socks off and then threw his socks in the mud. In attempting to

31

confirm Rogers's story, the trial court learned from the guards in the holding cell that Rogers had stuffed his socks down the toilet.  The court then asked Rogers's standby counsel Davidson to give Rogers a new pair of socks.

Rogers then tried to interject with an explanation as to how he lost is socks. The trial court again had to tell Rogers to sit down multiple times.   (Warning #30). Rogers retorted, "We're going to have problems," and remained standing and continued to argue with the trial court despite repeated orders for him to sit down. Rogers also scolded the trial court and said, "You can't say that kind of stuff," referring to the court's statement that Rogers stuffed his socks down the toilet. Exasperated and frustrated, the trial court warned, "Close your mouth or you will be gagged."  (Warning #31).  Rogers snapped, "Well, you might as well—you're doing everything else you want to do."  The trial court then asked the bailiff to place duct tape over Rogers's mouth.  Before the tape was applied, Rogers blurted out, "This is ridiculous, your honor."

After Rogers's mouth was covered by tape, the trial court addressed Rogers: "You have been gagged because you have just continually disrupted this court and been disrespectful.  And I've told you.  I've warned you and warned you and warned you."   The court then stated that the next testimony would be in the form of a deposition read to the jury.  The court told Rogers that he could object by

32

raising his hand and said that the court would also be reading along with the deposition to make sure that "each and every word" in the deposition is read as indicated. The court also told Rogers that it would remove the tape after the deposition was read and that the tape would remain removed if Rogers would agree "to abide by [the] court's instructions and behave [him]self."

The jury then returned to the courtroom, and the deposition was read to the jury. After the deposition was read, the jury was excused, and the trial court allowed Rogers to remove the tape from his mouth. Because Rogers had raised his hand after the reading of the deposition, the court asked Rogers to state his objection. Rogers stated that he should not have been gagged. Because Rogers did not object to the anything related to the reading of the deposition itself, the court proceeded to the next witness.

The trial court also stated that it would allow Rogers to proceed without the gag if he agreed "to abide by [the court's] instructions and not make inappropriate comments in front of th[e] jury." When asked if he could follow those instructions, Rogers responded, "I'm doing the best I can. I don't see what I did inappropriate." The trial court allowed Rogers to remain un-gagged but warned, "The first time you make an inappropriate comment and I tell you to be quiet and sit down, if you don't comply with that instruction, you will be gagged again."

33

Rogers then requested that a curative jury instruction regarding the prior use of the gag. After allowing Rogers to consult with his standby counsel as to what instruction should be given, Rogers proposed this curative instruction: "The defendant was duct taped based on the Judge's decision regarding the defendant trying to assert himself on an issue not relative [sic] to courtroom proceedings, and don't let what you saw affect your opinion of this defendant." Rogers emphasized that he wanted it "noted that what [he] was duct taped for didn't have anything to do with the court."

After considering Rogers's proposed instruction and his reasons for the instruction, the trial court said that it did not agree with Rogers's characterization of the reasons for the court's decision to tape Rogers's mouth. The trial court said, "The reason I made the decision to duct tape you was directly because of your continuing and ongoing conduct." The court made clear that its reason for taping Rogers's mouth was directly related to the trial.

Ultimately, the state trial court instructed the jury as follows: "When you were out here before, the defendant had duct tape across his mouth. It was my decision to gag the defendant in that fashion. That was my decision. No inference harmful to the defendant or his case should be made by you based on that decision I made."

Before the jury returned to the courtroom and received the curative instruction, Rogers moved for a mistrial because, he argued, the gag was "extremely prejudicial" and "unwarranted." The trial court denied Rogers's motion based on "everything that proceeded before this."

The next day, the prosecution finished presenting its case. However, before the prosecution rested, Rogers renewed, and the trial court denied, his motion for a mistrial based on his being gagged in front of the jury.

Ultimately, the jury convicted Rogers of all counts in the indictment.

## B.    Procedural History

After his conviction, Rogers, with the assistance of newly appointed counsel Kenner, again moved for a mistrial. In that motion, Rogers argued, inter alia, that the state trial court should have used less restrictive means before ordering him gagged and that the gagging violated his right to be tried by an impartial jury, as guaranteed by the Sixth Amendment and the Georgia Constitution. Rogers renewed these arguments in his counseled direct appeal and his pro se state habeas petition. And, in his pro se state habeas petition, Rogers argued that the trial court erred in failing to declare a mistrial after the jury saw him with tape over his mouth. None of these challenges succeeded.

Rogers now brings the same arguments in his federal § 2254 habeas petition.

35

## C.    Constitutionality of the Restraint

Rogers argues that the Georgia courts unreasonably applied clearly established federal law when they upheld the state trial court's decision to briefly gag Rogers during his trial.

Rogers's claim is governed by the legal principles announced in Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057 (1970), and must be viewed through the "highly deferential" standard of AEDPA.  See Lee v. Comm'r, Alabama Dep't of Corr., 726 F.3d 1172, 1192 (11th Cir. 2013) cert. denied, No. 13-775, 2014 WL 1124864 (U.S. Mar. 24, 2014) ("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." (quotation marks omitted)).

In Allen, the U.S. Supreme Court concluded that "flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated."  397 U.S. at 343, 90 S. Ct. at 1061.  Because "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations," the Allen Court held that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."  Id. at 343, 90 S. Ct. at 1059–62 (upholding the trial court's decision to remove the defendant from the courtroom where that defendant

36

argued with the judge in disrespectful manner and continued to "talk back" to the judge even after the judge warned the defendant that his next "outbreak" would result in his removal from the courtroom).

Consistent with its holding, the Allen Court concluded that there were "at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . :  (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."  Id. at 343–44, 90 S. Ct. at 1061.  The Allen Court noted that, if any rights are lost (such as the right to confront witnesses), those rights can "be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."  Id. at 343, 90 S. Ct. at 1061.

Here, the record establishes that Rogers repeatedly and without apology continuously interrupted courtroom proceedings despite his receipt of at least 31 warnings and admonitions over several days before and during trial.  And, the U.S. Supreme Court's instruction in Allen gave the state trial court guidance as to how it could handle a "disruptive, contumacious, stubbornly defiant defendant[]" like Rogers.  First, the trial court must warn the defendant of the potential consequences of continuing his disruptive behavior.  See id. at 343, 90 S. Ct. at

37

1060–61.  Second, the trial court may act consistently with its warning and in a manner that is appropriate given the circumstances of the trial and the nature of the conduct occurring in the courtroom.  See id.

Here, the state trial court repeatedly warned Rogers that it would gag him if he continued to disrupt and delay the trial.  In fact, the trial court warned Rogers during a pre-trial conference, the day of jury selection, the day of opening statements, the first day of witness examination, and the second day of witness examination.  And, in case that was not enough, the state trial court reiterated its warning several times—to no avail—in the moments before Rogers was actually gagged.  Only when Rogers failed to cease his disruptive and inappropriate behavior did the trial court follow through with its repeated warnings that it would have Rogers's mouth covered with tape.

After Rogers's frequent, unceasing interruptions took place, "the arsenal of authority described in Allen [became] available to the trial judge to keep order in the courtroom."  See Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91 S. Ct. 499, 504 (1971).  And, the trial court's chosen action—to briefly gag Rogers during the reading of one deposition—falls within the U.S. Supreme Court's instruction in Allen.  Thus, we cannot say that the Georgia courts unreasonably applied clearly established federal law—Allen and its progeny—when they upheld the state trial

38

court's decision to briefly gag Rogers during his trial given the particular facts and circumstances surrounding Rogers's behavior at trial. See Lee, 726 F.3d at 1192 ("A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no fairminded jurist could agree with the state court's determination or conclusion." (quotation marks omitted)).

In fact, given the circumstances of Rogers's case, gagging Rogers for the limited time done here was, perhaps, the most appropriate remedy. See Allen, 397 U.S. at 344–45, 90 S. Ct. at 1061–62 (listing binding and gagging, removal from the courtroom, or criminal contempt sanctions as possible remedies). For instance, Rogers proceeded pro se at trial; therefore, removing him from the courtroom could have limited his ability to conduct his defense. Removing Rogers from the courtroom would also have limited his ability to confront witnesses against him. And, Rogers faced several life sentences, so criminal contempt sanctions would likely have had a limited, if any, deterrent effect. By contrast, the action taken here—covering Rogers's mouth with tape while allowing him to remain in the courtroom, hear testimony, and raise his hand to alert the court that he had objections—achieved the state trial court's dual goals of restoring "dignity, order, and decorum" to the proceedings and allowing Rogers to continue to represent himself. Id. at 343, 90 S. Ct. at 1061.

39

In short, the Georgia courts did not unreasonably apply clearly established federal law when they determined that the courses which <u>Allen</u> lays open to trial judges for coping with courtroom tactics of the sort engaged in by Rogers enabled the state trial court to deal with Rogers in the way that it did.  See <u>Lee</u>, 726 F.3d at 1192 ("To be entitled to federal habeas relief under § 2254, a petitioner must show that the state court's ruling was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' " (quoting <u>Harrington v. Richter</u>, 562 U.S. ——, ——, 131 S. Ct. 770, 786–87 (2011)).  And, under AEDPA, this Court cannot grant § 2254 habeas relief based on any argument from Rogers that the Georgia courts failed to extend <u>Allen</u> to make that otherwise clearly established law fit the facts of Rogers's case.  <u>Accord</u> <u>White v. Woodall</u>, 572 U.S. ——, ——, slip op. at 11 (U.S. Apr. 23, 2014).

Because Rogers has not shown that the Georgia courts unreasonably applied clearly established federal law when they upheld the trial court's decision to briefly gag Rogers during his trial, we affirm the district court's denial of relief based on the in-trial gagging incident.

40

**D.    Mistrial Resulting from the Restraint**

In his final claim for which we granted a COA, Rogers argues that his claim that the state trial court erred when it did not declare a mistrial as a result of the brief taping of Rogers's mouth is not procedurally defaulted.

The merits of this "mistrial" issue are intertwined with the merits of the substantive "restraint" issue—that is, because the Georgia courts did not unreasonably apply clearly established federal law when they upheld the trial court's decision to gag Rogers given the particular facts and circumstances surrounding Rogers's behavior at trial, the state courts did not err in declining to grant a mistrial because of the brief gagging incident.

Because Rogers's mistrial claim fails under our mandated deferential AEDPA review, we need not determine whether Rogers's mistrial claim was procedurally defaulted.

## V.  CONCLUSION

For the reasons stated above, we affirm the district court's denial of Rogers's § 2254 habeas petition.

**AFFIRMED.**

41